IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| HALLMARK CARDS, INC., | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 07-0357-CV-W-ODS ) |
| MONITOR COMPANY GROUP LIMITED PARTNERSHIP, | ) ) ) ) |
| Defendant. | ) |

### ORDER AND OPINION GRANTING PLAINTIFF'S MOTION FOR FINDING OF CONTEMPT, SETTING A HEARING SO THAT A FINE MAY BE ASCERTAINED, AND AMENDING THE INJUNCTION

Pending is Hallmark's motion asking for a finding of contempt and imposition of sanctions against Monitor Company Group Limited Partnership ("Monitor"). For the following reasons, the motion (Doc. # 30) is granted.

### I. BACKGROUND

Monitor is a sophisticated, large strategy-consulting company that serves domestic and international clients, including many in the Fortune 500. Its annual professional fee revenues number in the hundreds of millions of dollars and it has approximately 1,200 employees in 26 offices located around the world. Under a 2001 Consulting Services Agreement (the "Consulting Agreement") Hallmark paid Monitor in excess of $12 million and entrusted Monitor with commercially and competitively sensitive information and trade secrets, including long-term business strategies, contract terms with customers, pricing and margins, and cost data. Hallmark became concerned in late 2005 when Monitor Clipper Partners, LLC ("MCP"), an investment firm and close affiliate of Monitor, announced it was acquiring Recycled Paper Greetings, Inc. ("RPG"), a direct competitor of Hallmark in the greeting card industry. Fearing that Hallmark Confidential Information in Monitor's possession may have been unlawfully

transmitted to and used by MCP in its acquisition of RPG or that such information might be used to enhance RPG's value post-acquisition, Hallmark requested assurances from Monitor, listed Monitor employees known to have access to Hallmark's data, and demanded that Monitor "make all additional inquiries to determine whether other individuals were involved" in the RPG acquisition "or have relevant documents."

Hallmark was not satisfied with Monitor's actions and assurances, so in 2006 Hallmark commenced an arbitration action against Monitor as provided in the Consulting Agreement. Hallmark's claims against Monitor in the arbitration proceeding concerned Monitor's breach of the Consulting Agreement's confidentiality provisions and Monitor's misappropriation of trade secrets and confidential information belonging to Hallmark (the "Hallmark Confidential Information"). The Arbitrator announced his preliminary conclusions following closing arguments on February 9, 2007, and ruled that Hallmark was entitled to injunctive relief. The broad contours of the Injunction were agreed to by the parties on the final day of the arbitration hearing in a discussion moderated by the Arbitrator. On March 21, 2007, the Arbitrator entered judgment against Monitor, signed the Injunction, and awarded Hallmark $4.1 million in damages. On May 11, 2007, Hallmark and Monitor jointly initiated an action before this Court seeking confirmation of the award and entry of the Injunction by this Court. On May 18, 2007, the Court confirmed the arbitrator's decision. Part of the order declared as follows:

> ORDERED that, pursuant to 9 U.S.C. § 9, the Injunction entered in the matter Hallmark Cards, Incorporated v. Monitor Company Group Limited Partnership, Case No. 57 181 00014 06 before the American Arbitration Association, a copy of which is attached to this order and incorporated by this reference, is hereby entered in this matter and shall have the same force and effect as if originally entered by this Court.

On December 2, 2008, the Court granted Hallmark's Motion for Relief from Judgment. Having granted that relief, the Court re-examined the confirmation issue and concluded the monetary award could not be re-confirmed and remanded that issue to the Arbitrator. The Court denied Hallmark's request for judicial intervention in the

2

Injunction's administration because there were "no allegations of improprieties in Defendant's compliance with the injunction."

On June 22, 2009, Hallmark filed its Motion for Order of Civil Contempt and Sanctions Against Monitor Company Group Limited Partnership For Failure to Comply With the Injunction. An evidentiary hearing was held on October 5. The following issues need to be decided: (1) Whether Monitor violated paragraphs 1 and 2(a) by failing to interview Megan Kahn, failing to secure her computer before its memory was erased, and failing to search her office, and (2) whether Monitor violated paragraph 4's prohibition on "consulting with Monitor Clipper Partners, L.P. in connection with any matter affecting Recycled Paper Greetings, Inc." and (3) whether the Injunction needs to be amended.

## II. DISCUSSION

"The party seeking a contempt order bears the burden of proving facts warranting such relief by clear and convincing evidence." Jake's, Ltd. v. City of Coates, 356 F.3d 896, 899-900 (8th Cir. 2004).

### A.

The first issue relates to efforts to locate and retrieve all confidential information supplied by Hallmark and other information derived from that confidential data. Paragraph 1 required Monitor to "make a search of all its electronic systems, including its servers, freestanding computers, mainframes, databases, laptops, desktops, and all other work stations" to locate Hallmark Data. "Hallmark Data" is defined to include documents or other information "that refers or relates in any way to (a) Hallmark, the greeting card industry, or the gifts industry that was provided by Hallmark to Monitor, or was created or acquired by Monitor as part of Monitor's Hallmark work, or (b) Monitor's work for Hallmark . . . ." Paragraph 2(a) required Monitor to "conduct a physical search of the offices and other storage locations used by an Monitor employee . . . and who is

3

known to have authored or received (a) electronic or hard copy documents containing Hallmark Data; or (b) training in which such documents were used to look for any hard copy documents containing Hallmark Data."

Megan Kahn (a/k/a Emily Kahn and E. Megan Kahn) was a Monitor Consultant working on the MCP Standing Case Team during 2005 and 2006 along with Grant Brown, Jeffrey Pauker and Daniel Jang. Standing Case Teams consisted of Monitor employees who worked on projects for MCP. Overwhelming evidence establishes Kahn was heavily involved in evaluating MCP's potential acquisition of RPG and that she received and reviewed Hallmark Data. Kahn's potential involvement was also known to Monitor at least by October 2006; indeed, the evidence suggests Kahn was a rather critical member of the Standing Case Team. In making these findings, the Court explicitly declares that it does not find Steven Jennings' testimony to be credible. The Court also rejects Monitor's claim that it was somehow "confused" by Kahn's varied use of "Megan" and "Emily" as her first name – the Court finds the explanation incredible and believes Monitor was well-aware of Kahn's identity and involvement in MCP's evaluation of RPG.

Kahn left her employment with Monitor on June 15, 2007. Despite knowing about Kahn's access to and involvement with the Hallmark Data, Monitor did not interview her or search her laptop. Monitor also did not search her office before Kahn left, leading to a high probability that (in accordance with Monitor's policies) many or most documents that were there have been destroyed. This deprived Hallmark of the ability to fully identify the flow of its confidential information, which itself is critical to insuring that none if it remains with Monitor. Documents that were in Kahn's office may have shown (1) from whom she received data and (2) to whom she sent it – but now, such determinations cannot be made.

The laptop issued to Kahn was not searched; all searching was performed on backed-up and archived copies on Monitor's server. This is significant for several reasons. First, when Kahn left, Monitor – in accordance with its standard procedures – erased the hard drives and reissued the computer. While employee computers are backed up, it was possible – and not uncommon – for information to be stored in a file

4

or directory that was not backed up. Thus, while Monitor was able to search archived versions of Kahn's backup files, the opportunity to search other locations on her laptop that were not backed up was irretrievably lost when Monitor erased the computer's hard drive. Second, even with respect to backed up files, documents deleted by a user from his or her My Documents and Desktop folders are permanently erased from the backup files when the next full backup occurs. At that point, the only possible copy of these "deleted" documents would be in other locations on the user's laptop, such as the Recycle Bin – but Monitor did not search these locations on Kahn's laptop. Finally, once the Injunction was issued, no efforts were made to prevent employees (including Kahn) from deleting documents, e-mails, records or files from the computer system.[1]

The Court cannot say with certainty that a search of Kahn's computer would have revealed anything of value – but the Injunction was designed to provide assurances. Moreover, given Kahn's importance to the Standing Case Team and the inadequate explanations offered by Monitor, the Court can only conclude that Monitor (1) intentionally violated the Injunction or (2) was unconcerned about complying with the Injunction.

B.

Section 4 of the Injunction provides as follows:

> The Monitor Entities shall refrain from consulting with Monitor Clipper Partners, L.P. in connection with any matter affecting Recycled Paper Greetings, Inc. ("RPG") and shall likewise refrain from consulting with RPG on any matter, in both instances for a period of two (2) years after

---

[1] Monitor contends it could not search Kahn's computer until after the search protocol was established. This is true, but does not excuse Monitor's conduct. It knew a search was required and yet it erased her hard drive. The Injunction was effective when entered, not later when the search protocol was developed. There was also no need for a "litigation hold" to be included in order for Monitor to realize that it was obligated to preserve Kahn's computer so it could be searched.

5

the delivery to Hallmark of the last of the sworn statements provided for in Paragraph 3.

Hallmark suggests Monitor has violated this provision by arranging for employees to "leave" Monitor and be "hired" by MCP. The Court agrees.

Monitor is a group of companies made up of two halves: the Monitor Action Company and the Merchant Bank. MCP is part of the Merchant Bank. The two business units function as a single firm. For instance,

- Monitor and MCP occupy the same office building and use the same computer system.
- Monitor provides office space to MCP at a discount — 80 percent of fair market value.
- Monitor and MCP share the same e-mail system, and Monitor consultants who move to MCP keep the same "@monitor.com" e-mail address. Furthermore, MCP officers and employees use and identify their e-mail addresses as ending with "@monitor.com."
- Until August 2007, Monitor provided MCP with access to its Knowledge Management database.
- In 2005 and 2006, seven (7) of the eight (8) managing directors of MCP were Group Leaders and partners at Monitor. Mark Thomas, a founder of Monitor, is a member of the Management Committee at Monitor. Bill Young is also a member of the Management Committee at Monitor. Both Thomas and Young are also managing partners at MCP, and thus wear "two hats," performing important roles at both Monitor and MCP.
- Monitor often loans its employees to MCP for a period of time.
- In 2003, Monitor Clipper Equity Partners Fund II (the entity that invested in RPG in 2005), MCP, Monitor, and other Monitor entities entered into a services agreement. MCP is the manager of Fund II, and Section 5 of the Fund II Services Agreement requires Monitor to use its best efforts to support Fund II and MCP including, but not limited to, giving MCP full

6

Case 4:07-cv-00357-ODS   Document 52   Filed 11/20/09   Page 6 of 10

access to Monitor's personnel, data, know-how, expertise and infrastructure. As further incentive to meeting those shared goals, Monitor entities and employees benefit by receiving a share of the Fund II profits.

Against this backdrop, the following events occurred:

- Valerie Sakimura worked for Monitor through January 31, 2008. She was on the Standing Case Team and worked on RPG matters alongside Megan Kahn of Monitor and Rahul Lulla of MCP. Monitor disbanded the Standing Case Team on January 31, 2008, at which time Sakimura immediately began work at MCP.

- Travis Danysh is a consultant for Monitor and was a member of the MCP Standing Case Team assigned to assist MCP from July 2007 until January 2008, when the MCP Standing Case Team was disbanded. In late December 2007, Danysh performed consulting services for MCP on an RPG-related matter. Monitor billed to MCP over one thousand ($1,000) dollars for Danysh's work, and MCP in turn billed that amount directly to RPG.

## C.

As indicated earlier, the Court is not persuaded by Monitor's explanations and it finds its witnesses (particularly Steven Jennings) to not be credible. Monitor contends it was not aware Kahn's significance in MCP's acquisition of RPG and her activities on the MCP Standing Case Team, but Monitor knew what its MCP Standing Case Team did for MCP and who was assigned to it and there is abundant evidence documenting her personal involvement in MCP's acquisition and operation of RPG. Monitor knew it was obligated to interview Kahn before she left and search her office: it did neither. Monitor knew it was obligated to search Kahn's laptop; instead, it erased her hard drive. With respect to consulting work for MCP, Monitor contends it has no control over MCP and cannot prevent employees from leaving to work for MCP. To the contrary, the

7

evidence detailed above is clear and convincing that Monitor and MCP are closely aligned and effectively function as a single firm, occupying a single building, sharing the same e-mail system, sharing resources and expertise, and having significant overlap in senior personnel.  Moreover, the Court is convinced Monitor has (at worst) intentionally or (at best) ignored the Injunction's prohibitions at least once by arranging or permitting Travish Daynsh's provision of consulting services to MCP on matters related to RPG.  The Court also finds Monitor has not taken effective steps to communicate the Injunction's prohibitions to its employees – in fact, the steps taken are not even reasonably calculated to be effective, and lead to circumstances in which employees have provided assistance to RPG (or to MCP on RPG matters) without realizing they were violating a court order.  The Court finds, by clear and convincing evidence, Monitor has intentionally violated the Injunction.  The Court also finds, by clear and convincing evidence, that Monitor has also violated the Injunction in circumstances that may not be intentional, but were the inevitable result of Monitor's failure (apparently borne from a lack of concern) to take effective steps to insure compliance.  Monitor's contention that it has expended  significant amounts of time and money to comply relates primarily to obligations other than those discussed so far (specifically, its obligation to locate and copy documents and files), so those efforts are not relevant to the present inquiry.

"Civil contempt may be employed either to coerce the defendant into compliance with a court order or to compensate the complainant for losses sustained, or both.  Either incarceration or a fine may accomplish the purpose of coercion, while, where compensation is intended, a fine is imposed, payable to complainant." Chicago Truck Drivers v. Brotherhood Labor Leasing, 207 F.3d 500, 505 (8th Cir. 2000) (quotation omitted).  The Injunction was simple and clear, yet Monitor has not taken meaningful steps to insure that its terms are obeyed.  Nothing in the Record supports an award of compensation for the violations (because the harm to Hallmark cannot be determined), but the Court concludes a fine is necessary in order to coerce Monitor into obeying the

8

Case 4:07-cv-00357-ODS   Document 52   Filed 11/20/09   Page 8 of 10

Injunction in the future. The Court reaches this conclusion after hearing – and largely disbelieving – Monitor's explanations and justifications for its past conduct and its promises of future compliance.

Unfortunately, the Court lacks the information necessary to determine the appropriate amount of the fine. Hallmark has suggested the Court could elect a multiples of either the amount of money spent to comply with the other, unrelated portions of the Injunction, the amount of the original arbitration award, or the value of the RPG acquisition. These calculations do not focus on the fine's objective, which is to coerce Monitor to comply with the Injunction. E.g., Souther Suburban Housing Ctr. v. Berry, 186 F.3d 851, 854-55 (7th Cir. 1999) (holding it is appropriate if not necessary to consider the contemnor's financial condition); Perfect Fit Indus., Inc. v. Acme Quilting Co., Inc., 673 F.2d 53, 57-58 (2d Cir. 1982) (district court can consider the magnitude of the harm to be prevented, the amount of the contemnor's finances, and the cost of complying with the injunction's disobeyed provisions). There being nothing in the record indicating that any particular award would be appropriately coercive, any amount awarded would necessarily be arbitrary. The Court concludes a hearing is necessary to ascertain an appropriate fine.

### D.

Hallmark has proffered evidence and arguments about some issues that have not been addressed. In some instances, those matters are completely beyond the purview of this proceeding. Monitor's production of materials during the arbitration is among the issues before the Arbitrator and will not be addressed by the Court. Monitor's actions before the Injunction were entered have not been considered because Monitor cannot be faulted for violating an Injunction that does not exist.

There is one issue that deserves further discussion. In setting the hearing, the Court noted one of the issues was whether Monitor violated

9

paragraph 3 of the Injunction by failing to produce electronic and hard copies of documents it found during the Injunction-mandated search. The Order noted "violations are alleged to have occurred in two ways: in some instances by the destruction of such documents, and in others by Defendant's simple failure to produce the documents it has found." At the hearing, Hallmark indicated it was no longer pursuing these allegations as a basis for contempt, but nonetheless sought an amendment to the Injunction in order to clarify Monitor's obligations. In Monitor's words, "[a]s for documents that must be produced, the injunction imposes no timeline for production or interim reporting requirements." Courts have the inherent power to modify injunctions, e.g., Railway Employees Dep't v. Wright, 364 U.S. 642, 646-47 (1961), and the lack of deadlines is a circumstance that should be corrected.

Monitor is directed to produce all documents that it has already identified as responsive to the Injunction's production requirements on or before December 10, 2009. On the last day of every month thereafter, Monitor shall produce all additional documents it identifies as responsive to the Injunction's production requirements. Monitor shall complete the process of searching, reviewing and producing documents by July 31, 2010.

## III. CONCLUSION

The Court finds, by clear and convincing evidence, that Monitor has violated the terms of the injunction and that a fine is necessary to coerce Monitor into obeying the injunction in the future. A hearing will be held at 9:30 a.m. on December 21, 2009, to allow the parties to present evidence and argument regarding the appropriate amount of the fine to be imposed. Each side shall have no more than one hour to present evidence and argument. Finally, the injunction is amended (as described previously on this page).
IT IS SO ORDERED.

                                                     /s/ Ortrie D. Smith
                                                   ORTRIE D. SMITH, JUDGE
DATE: November 20, 2009         UNITED STATES DISTRICT COURT